**Slip Op. 14-70**

UNITED STATES COURT OF INTERNATIONAL TRADE

| | | |
|---|---|---|
| _____ : | | |
| JACOBI CARBONS AB, | : | |
| JACOBI CARBONS, INC., NINGXIA | : | |
| GUANGHUA CHERISHMET | : | |
| ACTIVATED CARBON CO., LTD., | : | |
| CHERISHMET INC., BEIJING PACIFIC | : | |
| ACTIVATED CARBON PRODUCTS CO., | : | Before: Richard K. Eaton, Judge |
| LTD., DATONG MUNICIPAL | : | |
| YUNGUANG ACTIVATED CARBON | : | Consol. Court No. 12-00365 |
| CO., LTD., SHANXI INDUSTRY | : | |
| TECHNOLOGY TRADING CO., LTD., | : | |
| CARBON ACTIVATED CORP., | : | |
| CAR GO WORLDWIDE, INC., and | : | |
| TANGSHAN SOLID CARBON CO., | : | |
| LTD., | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| UNITED STATES, | : | |
| | : | |
| Defendant, | : | |
| | : | |
| and | : | |
| | : | |
| CALGON CARBON CORP. and NORIT | : | |
| AMERICAS, INC., | : | |
| | : | |
| Defendant-Intervenors. | : | |
| _____ : | | |

**<u>OPINION</u>**

[Plaintiffs' motions for judgment on the agency record are denied.]

Dated: June 24, 2014

*Daniel L. Porter*, Curtis, Mallet-Prevost, Colt & Mosle LLP, of Washington, D.C., argued for plaintiffs Jacobi Carbons AB and Jacobi Carbons, Inc.  With him on the brief was *Ross Bidlingmaier*.

*Francis J. Sailer*, Grunfeld Desiderio Lebowitz Silverman & Klestadt LLP, of Washington, D.C., argued for consolidated plaintiffs Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd., Cherishmet Inc., Beijing Pacific Activated Carbon Products Co., Ltd., Datong Municipal Yunguang Activated Carbon Co., Ltd., and Shanxi Industry Technology Trading Co., Ltd.  With him on the briefs were *Mark E. Pardo*, *Dharmendra N. Choudhary*, *Andrew T. Schutz*, and *Kavita Mohan*.

*Nancy A. Noonan* and *Matthew L. Kanna*, Arent Fox LLP, of Washington, D.C., for consolidated plaintiffs Carbon Activated Corp. and Car Go Worldwide, Inc.

*Gregory S. Menegaz*, deKieffer & Horgan, PLLC, of Washington, D.C., for consolidated plaintiff Tangshan Solid Carbon Co., Ltd.

*Antonia R. Soares*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for defendant.  On the brief were *Melissa M. Devine*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, *Stuart F. Delery*, Acting Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Reginald T. Blades, Jr.*, Assistant Director.  Of counsel on the brief was *Devin S. Sikes*, Attorney, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, of Washington, D.C.

*John M. Herrmann*, Kelley Drye & Warren, LLP, of Washington, D.C., argued for defendant-intervenors Calgon Carbon Corp. and Norit Americas, Inc.  With him on the brief were *David A. Hartquist* and *R. Alan Luberda*.

EATON, Judge: This matter is before the court on the USCIT Rule 56.2 motions

for judgment on the agency record of plaintiffs Jacobi Carbons AB and Jacobi Carbons, Inc.

(collectively, "Jacobi"),[1] and consolidated plaintiffs[2] Ningxia Guanghua Cherishmet Activated

Carbon Co., Ltd. ("GHC"), Cherishmet Inc. ("Cherishmet"), Beijing Pacific Activated Carbon

Products Co., Ltd. ("BPACP"), Datong Municipal Yunguang Activated Carbon Co., Ltd. ("Datong

Municipal"), Shanxi Industry Technology Trading Co., Ltd. ("Shanxi Industry"), Carbon Activated

---

[1]     Jacobi Carbons AB is a foreign producer and exporter of subject merchandise, while Jacobi Carbons, Inc. is the importer of record for Jacobi Carbons AB's merchandise. Compl. ¶ 3 (ECF Dkt. No. 7).

[2]     This action includes court numbers 12-00372, 12-00377, 12-00396, and 12-00401.  *See* Scheduling Order (ECF Dkt. No. 42).

Corp. and Car Go Worldwide, Inc. (collectively, "CAC"), and Tangshan Solid Carbon Co., Ltd.

("Tangshan") (collectively, "plaintiffs").  By their motions, plaintiffs, all of which are producers,

exporters, or importers of subject merchandise,[3] challenge the U.S. Department of Commerce's

("Commerce" or the "Department") Final Results in the fourth administrative review of the

antidumping duty order on certain activated carbon from the People's Republic of China

("PRC").  Certain Activated Carbon From the PRC, 77 Fed. Reg. 67,337 (Dep't of Commerce

Nov. 9, 2012) (final results of antidumping duty admin. review), and accompanying Issues and

Decision Memorandum ("Issues & Dec. Mem.") (collectively, "Final Results").

     Jacobi, GHC, Cherishmet, BPACP, Datong Municipal, CAC, and Tangshan contest two

aspects of the Department's Final Results: (1) the selection of the surrogate value for carbonized

material, which is one of the primary inputs used in the production of subject merchandise;[4] and

---

[3]     The subject merchandise is activated carbon, a substance "capable of collecting gases, liquids, or dissolved substances on the surface of its pores."  MCGRAW-HILL CONCISE ENCYCLOPEDIA OF SCIENCE & TECHNOLOGY 21 (Sybil P. Parker ed., 2d ed. 1987).  Activated carbon is described in the antidumping duty order as follows:

> [A] powdered, granular, or pelletized carbon product obtained by "activating" with heat and steam various materials containing carbon, including but not limited to coal (including bituminous, lignite, and anthracite), wood, coconut shells, olive stones, and peat.
> . . .
> The scope of this order covers all forms of activated carbon that are activated by steam or $CO_2$ [(carbon dioxide)] . . . . Unless specifically excluded, the scope of this investigation covers all physical forms of certain activated carbon . . . .
> . . .
> Excluded from the scope of the order are chemically-activated carbons. . . . Chemically activated carbons are typically used to activate raw materials with a lignocellulosic component such as cellulose, including wood, sawdust, paper mill waste and peat.

Certain Activated Carbon From the PRC, 72 Fed. Reg. 20,988, 20,988 (Dep't of Commerce Apr. 27, 2007) (notice of antidumping duty order).

[4]     In order to produce steam-activated carbon, the carbonized materials are placed in a furnace and activated through steam at temperatures between 800 and 1,000 degrees Centigrade.  Letter from Ross Bidlingmaier, Counsel for Jacobi, to The Honorable Rebecca M. Blank, Acting Secretary of Commerce, U.S. Department of Commerce at 99, PD 29, at bar

(footnote continued)

(2) the selection of the surrogate value for truck freight.  *See* Resp't Pls.' Rule 56.2 Mot. for J. on

the Agency R. 1–2 (ECF Dkt. No. 47) ("Jacobi's Br."); Mem. in Supp. of Pls.' Rule 56.2 Mot. for

J. upon the Agency R. 1 (ECF Dkt. No. 46) ("GHC's Br."[5]); Rule 56.2 Mot. for J. upon the

Agency R. of Pls. Carbon Activated Corporation and Car Go Worldwide, Inc. 2 ("CAC's Mot.");

Consol. Pl. Tangshan Solid Carbon Co., Ltd.'s Rule 56.2 Mot. for J. on the Agency R. 1–2

("Tangshan's Mot.").

　　　　Shanxi Industry and Tangshan (collectively, "separate rate companies" or "separate rate

respondents") are plaintiffs that established their independence from Chinese government control,

and as a result, were assigned a separate antidumping duty rate in the Final Results.  *See* Final

Results, 77 Fed. Reg. at 67,338.  The separate rate respondents and CAC[6] claim that, should

Commerce recalculate the final dumping margin for the mandatory respondents pursuant to any

remand ordered by the court, the Department must also recalculate the rate assigned to the separate

rate companies.  *See* Mem. of Law in Supp. of Pl. Shanxi Industry Technology Trading Co., Ltd.'s

Rule 56.2 Mot. for J. upon the Agency R. 2 (ECF Dkt. No. 44) ("Shanxi Industry's Br.");

Tangshan's Mot. 2; CAC's Mot. 2.

---

code 3027303-01 (Sept. 1, 2011), ECF Dkt. No. 43 (Apr. 5, 2013) ("Jacobi's Questionnaire
Response").  "This process produces a carbonaceous substance (i.e., activated carbons) with
many small pores."  Jacobi's Questionnaire Response at 99.

　　　[5]　　The Department treated GHC and BPACP as a single entity, based on a
determination in the first administrative review of the Order.  Final Results, 77 Fed. Reg. at
67,338 n.23.  Accordingly, Commerce assigned the entity a single rate.  Final Results, 77 Fed.
Reg. at 67,338 n.23.  Thus, although this brief was jointly submitted by GHC, Cherishmet,
BPACP, and Datong Municipal, the arguments made in this brief will be represented by
reference only to GHC.

　　　[6]　　The companies from which CAC imported subject merchandise are separate rate
companies.  CAC's Mot. 2.

Defendant United States opposes plaintiffs' motions and asks that Commerce's Final Results be sustained.  Def.'s Resp. to Pls.' and Consol. Pls.' Mots. for J. upon the Agency R. 2 (ECF Dkt. No. 56) ("Def.'s Br.").  Defendant-intervenors, Calgon Carbon Corp. and Norit Americas, Inc. (collectively, "defendant intervenors"), each domestic manufacturers of activated carbon, join in opposition to plaintiffs' motions.  Def.-Ints.' Resp. in Opp'n to Consol. Pls.' Mots. for J. on the Agency R. 1 (ECF Dkt. No. 58) ("Def.-Ints.' Br.").  Jurisdiction lies pursuant to 28 U.S.C. § 1581(c) (2006) and 19 U.S.C. §§ 1516a(a)(2)(A)(i)(I), (B)(iii) (2006).  For the reasons set out below, Commerce's Final Results are sustained.


## BACKGROUND

On April 27, 2007, the Department issued the antidumping duty order on certain activated carbon from the PRC.  Certain Activated Carbon From the PRC, 72 Fed. Reg. 20,988, 20,988 (Dep't of Commerce Apr. 27, 2007) (notice of antidumping duty order) (the "Order").  Following timely requests from defendant-intervenors and other companies, the Department conducted its fourth administrative review of the Order for the period of review ("POR"), April 1, 2010, through March 31, 2011.  Initiation of Antidumping and Countervailing Duty Administrative Reviews, 76 Fed. Reg. 30,912, 30,913 (Dep't of Commerce May 27, 2011).

On May 4, 2012, the Department published its Preliminary Results for the review, selecting Datong Juqiang Activated Carbon Co., Ltd.,[7] Jacobi, and GHC as mandatory respondents.  Certain Activated Carbon from the PRC, 77 Fed. Reg. 26,496, 26,497 (Dep't of Commerce May 4, 2012) (preliminary results of the fourth antidumping duty admin. review, and intent to rescind in part) ("Preliminary Results").  BPACP, Datong Municipal, Shanxi Industry, and Tangshan each filed

---

[7]     Datong Juqiang Activated Carbon Co., Ltd. is not a party to this action.

separate rate certifications, and Cherishmet and CAC joined as interested U.S. importers.  *See* Preliminary Results, 77 Fed. Reg. at 26,501.  In the Preliminary Results, Commerce "selected Thailand as the primary surrogate country for the valuation of the [factors of production] and surrogate financial ratios."  Mem. from Katie Marksberry, International Trade Specialist, to the File at 1, PD 193, at bar code 3072722-01 (Apr. 30, 2012), ECF Dkt. No. 43 (Apr. 5, 2013) ("Preliminary Results Surrogate Values Mem.").

Following publication of the Preliminary Results, Jacobi, GHC, Cherishmet, and BPACP submitted comments that placed on the record additional data from the Philippines, and urged the Department to use it to value all of the major material inputs.  Issues & Dec. Mem. at cmt. 1.  In the Final Results, Commerce found that "both the Philippines and Thailand [were] significant producers [of activated carbon] because, in quantity terms, they [were] exporters of goods identical to the subject merchandise, [and] ha[d] production of comparable merchandise as evidenced by the financial statements on the record."  Issues & Dec. Mem. at cmt. 1.  The Department determined, however, that although otherwise "relatively equal in terms of quality and satisf[action] of all of the surrogate value criteria," the Philippine data (particularly the financial statements) was "clearly superior" to the Thai data because it was "industry-specific, whereas the Thai data [was] for the manufacturing sector in general."  Issues & Dec. Mem. at cmt. 1.  The Philippine data was also found to be more contemporaneous to the POR than the Thai data.  Issues & Dec. Mem. at cmt. 1.

As a result, Commerce departed from its determination in the Preliminary Results, and selected the Philippines as the primary surrogate country to value most of the major material inputs used in the production of subject merchandise, including the carbonized material and truck

freight.[8]  Final Results, 77 Fed. Reg. at 67,338.  Specifically, the Department used Harmonized

Tariff Schedule ("HTS")[9] import data, derived from the Global Trade Atlas ("GTA"), from the

Philippines under heading HTS 4402 ("Wood Charcoal (Including Shell or Nut Charcoal),

Whether or Not Agglomerated") to value carbonized material, and used publicly available data

reported in the Cost of Doing Business in Legazpi City, Philippines ("Cost of Doing Business") to

value truck freight.  Mem. from Emeka Chukwudebe, Case Analyst, to the File at 3, 6, PD 283, at

bar code 3104537-01 (Nov. 2, 2012), ECF Dkt. No. 43 (Apr. 5, 2013) ("Final Results Surrogate

Values Mem.").


## STANDARD OF REVIEW

"The court shall hold unlawful any determination, finding, or conclusion found . . . to be

unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19

U.S.C. § 1516a(b)(1)(B)(i) (2006).

---

[8]      Global Trade Atlas import data from Thailand, however, was found by the
Department to be superior for two inputs: bituminous coal and pitch.  Issues & Dec. Mem. at
cmt. 1; Mem. from Emeka Chukwudebe, Case Analyst, to the File at 2, 3, PD 283, at bar code
3104537-01 (Nov. 2, 2012), ECF Dkt. No. 43 (Apr. 5, 2013) ("Final Results Surrogate Values
Mem.").  Accordingly, the Department used the Thai data to value bituminous coal and pitch,
despite using Philippine data to value all other major factors of production.  Issues & Dec. Mem.
at cmt. 1; Final Results Surrogate Values Mem. at 2, 3.  These findings are uncontested.

[9]      The purpose of the HTS is to provide a certain level of organization to the
classification of imported goods.  "The tariff schedules of signatories to the Harmonized System
Convention are required to have tariff categories 'harmonized with the internationally-developed
HS nomenclature up to the six-digit level, *i.e.*, to the two-digit chapter, the four-digit heading,
and the six-digit subheading levels.'"  *Xinjiamei Furniture (Zhangzhou) Co. v. United States*, 38
CIT __, __ n.2, 968 F. Supp. 2d 1255, 1261 n.2 (2014) (internal quotation marks omitted)
(quoting *Victoria's Secret Direct, LLC v. United States*, 37 CIT __, __, 908 F. Supp. 2d 1332,
1345 (2013)).

## DISCUSSION

### I.   LEGAL FRAMEWORK

"The United States imposes duties on foreign-produced goods that are sold in the United States at less-than-fair value." *Clearon Corp. v. United States*, 37 CIT __, __, Slip Op. 13-22, at 4 (2013).  The Department is responsible for making the fair value determination, and is directed by statute to make a "comparison . . . between the export price or constructed export price[10] and normal value." 19 U.S.C. § 1677b(a) (2006).  Where, as here, the merchandise in question is exported from a nonmarket economy country,[11] "the normal value of the subject merchandise [is based on] the value of the factors of production utilized in producing the merchandise and [an] added . . . amount for general expenses and profit plus the cost of containers, coverings, and other expenses." *Id.* § 1677b(c)(1)(B).

---

[10]     Under the statute, the terms "export price" and "constructed export price" are defined as follows:

> The term "export price" means the price at which the subject merchandise is first sold (or agreed to be sold) before the date of importation by the producer or exporter of the subject merchandise outside of the United States to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States . . . .
>
> . . .
>
> The term "constructed export price" means the price at which the subject merchandise is first sold (or agreed to be sold) in the United States before or after the date of importation by or for the account of the producer or exporter of such merchandise or by a seller affiliated with the producer or exporter, to a purchaser not affiliated with the producer or exporter . . . .

19 U.S.C. § 1677a(a)–(b) (2006).

[11]     A nonmarket economy country is a "foreign country that the [Department] determines does not operate on market principles of cost or pricing structures, so that sales of merchandise in such country do not reflect the fair value of the merchandise." 19 U.S.C. § 1677(18)(A).  Because the Department deems the PRC "to be a nonmarket economy country, Commerce generally considers information on sales in [the PRC] and financial information obtained from Chinese producers to be unreliable for determining, under 19 U.S.C. § 1677b(a), the normal value of the subject merchandise." *Shanghai Foreign Trade Enters. Co. v. United States*, 28 CIT 480, 481, 318 F. Supp. 2d 1339, 1341 (2004).

To determine the normal value of the subject merchandise, Commerce is directed to use "the best available information regarding the values of such factors in a [comparable] market economy country or countries considered to be appropriate by the [Department]." *Id.* Commerce's practice, in selecting the best available information for valuing factors of production, is to "choose surrogate values that represent broad market-average prices, prices specific to the input, prices that are net of taxes and import duties, prices that are contemporaneous with the POR, and publicly available non-aberrational data from a single surrogate market-economy." *Clearon*, 37 CIT at __, Slip Op. 13-22, at 7 (citation omitted) (internal quotation marks omitted); *see also* 19 C.F.R. § 351.408(c)(2) (2012) ("[T]he Secretary [of Commerce] normally will value all factors [of production] in a single surrogate country."). The Department's task is to "attempt to construct a hypothetical market value" of the subject merchandise in the nonmarket economy. *Nation Ford Chem. Co. v. United States*, 166 F.3d 1373, 1375 (Fed. Cir. 1999).

## II.   EXHAUSTION OF ADMINISTRATIVE REMEDIES

As an initial matter, defendant and defendant-intervenors claim that plaintiffs failed to exhaust their administrative remedies with respect to certain arguments. They contend that plaintiffs failed to present these arguments during the underlying administrative proceeding, and are thus, prohibited from making them now before the court. Specifically, defendant and defendant-intervenors allege that plaintiffs failed to present their arguments before Commerce with respect to (1) the Philippine surrogate value for truck freight selected by the Department, and (2) claims that the import data under Philippine HTS 4402 is not the best available

information when compared to the domestic Cocommunity data[12] and the price data used by

Commerce to value carbonized material in prior reviews.  Def.'s Br. 27–37; Def.-Ints.' Br. 10–

13.

　　　The court finds defendant and defendant-intervenors' exhaustion claims to be

unpersuasive.  A court "shall, where appropriate, require the exhaustion of administrative

remedies."  28 U.S.C. § 2637(d) (2006); *Yangzhou Bestpak Gifts & Crafts Co. v. United States*,

716 F.3d 1370, 1381 (Fed. Cir. 2013).  "To exhaust its administrative remedies, a party usually

must submit a case brief 'present[ing] all arguments that continue in [its] view to be relevant to

[Commerce's] final determination or final results.'"  *Qingdao Taifa Grp. Co. v. United States*, 33

CIT 1090, 1092–93, 637 F. Supp. 2d 1231, 1236 (2009) (alterations in original) (quoting 19

C.F.R. § 351.309(c)(2) (2012)).  This Court has held, however, that requiring exhaustion may be

inappropriate under certain circumstances.  For instance, "[a] party . . . may seek judicial review

of an issue that it did not raise in a case brief if Commerce did not address the issue until its final

decision, because in such a circumstance the party would not have had a full and fair opportunity

to raise the issue at the administrative level."  *Id.* at 1093, 637 F. Supp. 2d at 1236 (citing *LTV*

*Steel Co. v. United States*, 21 CIT 838, 868–69, 985 F. Supp. 95, 120 (1997)).

　　　Here, in the Final Results, Commerce changed the primary surrogate country from

Thailand to the Philippines to value most of the major factors of production used in the

production of subject merchandise.  Issues & Dec. Mem. at cmt. 1.  In its Preliminary Results,

where it used Thailand as the primary surrogate country, Commerce valued carbonized material

---

[12]　　　As shall be seen, the term "Cocommunity data" means data derived from a
monthly publication of the Asian and Pacific Coconut Community.  Letter from Ross
Bidlingmaier, Counsel for Jacobi, to The Honorable John Bryson, Secretary of Commerce, U.S.
Department of Commerce at 47, PD 101, at bar code 3041311-01 (Nov. 16, 2011), ECF Dkt. No.
43 (Apr. 5, 2013) ("Jacobi's Surrogate Value Comments").

using GTA import data derived from Thai HTS 440290, and used publicly available Thai data

from a Thai consulting company to value truck freight transportation costs.  Preliminary Results

Surrogate Values Mem. at 9, 13.  Following publication of the Preliminary Results, the parties

submitted case and rebuttal briefs to the Department regarding its determinations, and while

plaintiffs argued for the use of the Philippine data, they could hardly foresee what use the

Department would make of that data.

In the Final Results, Commerce departed from its prior determinations by selecting the

Philippines as the primary surrogate country to value most of the factors of production.  Issues &

Dec. Mem. at cmt. 1.  Thus, Commerce valued the carbonized material input using Philippine

HTS 4402, and valued truck freight using publicly available data reported in the Cost of Doing

Business in Legazpi City, Philippines.  Final Results Surrogate Values Mem. at 3, 6.  As a result, it

was not until after the submission of the parties' case briefs that Commerce made its determination

to select the Philippines as the primary surrogate country, and articulated its basis for its selection

of sources to value carbonized material and truck freight (i.e., Philippine HTS 4402 and Cost of

Doing Business).  It is simply too much to ask of the parties to anticipate (1) that Commerce would

change the surrogate country between the preliminary and Final Results, (2) the reasons that the

Department would state for deciding to change surrogate countries, and (3) precisely how

Commerce would value the various inputs.  Under similar circumstances, it has been held that a

party "is not required to predict that Commerce would accept other parties' arguments and change

its decision." *Qingdao*, 33 CIT at 1093, 637 F. Supp. 2d at 1237.  Accordingly, because

plaintiffs had no realistic opportunity to present their arguments before the Department, the court

finds that plaintiffs did not fail to exhaust their administrative remedies.

III.   **COMMERCE'S CHOICE OF A SURROGATE VALUE FOR CARBONIZED MATERIAL IS IN ACCORDANCE WITH LAW AND SUPPORTED BY SUBSTANTIAL EVIDENCE**

A.     **The Cocommunity Data Is Deficient**

In the Final Results, the Department found that the Cocommunity[13] price data placed on the record by Jacobi was not the best available information to value the carbonized material input.  *See* 19 U.S.C. § 1677b(c)(1)(B).  Plaintiffs object to this finding.

When making a "best available information" finding, this Court, among other things, has repeatedly confirmed the importance that the information used to value the factors of production (1) represents a broad market average of prices for the input in question, and (2) be exclusive of taxes and duties.  *See, e.g.*, *Jining Yongjia Trade Co. v. United States*, 34 CIT __, __, Slip Op. 10-134, at 23 (2010) ("Commerce's practice, in selecting the best available information for valuing [factors of production], is to select surrogate values which are . . . representative of a broad market average . . . and exclusive of taxes and duties." (citation omitted) (internal quotation marks omitted)).

As noted, in the Final Results, Commerce selected the Philippines as the primary surrogate country to value most of the major factors of production used in the manufacture of activated carbon.  Final Results, 77 Fed. Reg. at 67,338.  Specifically, the Department used HTS import data derived from the GTA from the Philippines under heading HTS 4402[14] ("Wood

_____

[13]        Cocommunity is a monthly publication of the Asian and Pacific Coconut Community that contains news, statistical data, and domestic prices for coconut shell charcoal in the Philippines.  Jacobi's Surrogate Value Comments at 47.  "[T]he [Asian and Pacific Coconut Community] is an independent regional intergovernmental organization which consists of sixteen member countries and accounts for 85–90% of the world production of coconut."  Jacobi's Surrogate Value Comments at 47.

[14]        In its Issues and Decision Memorandum, Commerce misidentified the tariff heading that it was using as Philippine HTS 4402.90.00.  *See* Issues & Dec. Mem. at cmt. 1
                                                                                          (footnote continued)

Charcoal (Including Shell or Nut Charcoal), Whether or Not Agglomerated") to value carbonized

material, one of the important material inputs used in the production of activated carbon.  Final

Results Surrogate Values Mem. at 3.

        Although plaintiffs argue for the use of the Cocommunity data that they placed on the

record to value the carbonized material input, it is clear that the data is deficient in at least two

important respects.  The Cocommunity data's deficiencies begin with its limited geographical

scope for the prices, in the Philippines, of carbonized material derived from coconut shell

charcoal.  The Cocommunity publication unmistakably indicates that its Philippine prices for

coconut shell charcoal are based only on one geographical area.  That is, the data came only from

the Visayas region.[15]  *See* Letter from Ross Bidlingmaier, Counsel for Jacobi, to The Honorable

John Bryson, Secretary of Commerce, U.S. Department of Commerce at 51, PD 101, at bar code

3041311-01 (Nov. 16, 2011), ECF Dkt. No. 43 (Apr. 5, 2013) ("Jacobi's Surrogate Value

Comments") ("**Coconut Shell Charcoal**: Philippines (Domestic), *Visayas*, Buyer" (emphasis

added)).  A review of the "Prices of Coconut Products and Selected Oils (US$/MT)" ledger

makes that much clear.  *See* Jacobi's Surrogate Value Comments at 51.

        GHC, in its case brief, acknowledges that the Cocommunity publication lacked

countrywide data.  GHC's Br. 27 ("[T]he product specific Cocommunity data, even though

---

("First, the publicly available import data from the Philippines under HTS 4402.90.00 comes from
an approved surrogate country.").  Having reviewed the record, however, it is clear that Commerce
analyzed the Philippine import data under the four-digit heading, HTS 4402, and not under
4402.90.00. *See, e.g.*, Issues & Dec. Mem. at cmt. 1 (properly naming the section heading two
lines above its inadvertent error, as "Philippine GTA Import Data 4402.00.00"); Final Results
Surrogate Values Mem. at 3 ("For the final results, we valued carbonized material using GTA
data from the Philippines, specifically HTS 4402.00, for a value of 53.73 Ps/Kg.").

        [15]      The Visayas is one of three geographical regions, consisting of several islands
that make up the Philippines.

lacking country wide coverage, represent a far more suitable surrogate value data source."). Thus, the Cocommunity prices are less representative of broad market averages than the GTA data for HTS 4402, which provides nationwide data for imports of carbonized materials that enter the Philippines from its global trading partners. Moreover, despite GHC's assertions, plaintiffs identify no record evidence demonstrating that the Cocommunity data is, in fact, representative of a broad market average. That is, plaintiffs point to no record evidence suggesting that the Visayas region represents a substantial portion of the market for activated carbon in the Philippines, or that these prices are reflective of the national Philippine market for the subject merchandise. It is therefore apparent that the import data represents a broader market average than the Cocommunity data, and that the Cocommunity data fails to provide the "broad market average" of prices reasonably preferred by Commerce when making a best available information finding.

Next, aside from Jacobi's own statements in its surrogate value comments submitted to Commerce, plaintiffs cite no record evidence demonstrating that the Cocommunity prices are tax and duty exclusive. *See* Jacobi's Surrogate Value Comments at 5 ("[T]he data in *Cocommunity* meet the Department's criteria of being specific to the input in question and the data tax exclusive."). As has been noted, that a price be "exclusive of tax and duties" is another important preference for Commerce when considering the "best available information," so that an "apples to apples" calculation can be made when constructing normal value. The Department has found that import data is "reported on a duty-exclusive, tax-exclusive basis." *Shandong Huarong Gen. Corp. v. United States*, 25 CIT 834, 845, 159 F. Supp. 2d 714, 725 (2001); *see also* Issues & Dec. Mem. at cmt. 1 ("Finally, the Department previously has found that data from

the [GTA], such as that on the record, is publicly-available, represents a broad market average, and is *tax and duty exclusive*." (emphasis added) (citation omitted)).

The burden of building the administrative record lies with the interested parties. *QVD Food Co. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011) (citations omitted). Thus, the burden, here, rested with plaintiffs to supply Commerce with a probative source showing that the Cocommunity prices were free of tax and duty. Because plaintiffs put no evidence on the record showing that the Cocommunity data was tax and duty free, the data lacks an important criterion looked at in a best available information determination.

Based on the foregoing, the Department's finding that the Cocommunity data lacked two important preferences looked to by Commerce when making a best available information determination was reasonable.

### B.      Commerce's Past Practice

GHC also contends that Commerce's failure to use the Cocommunity data as the surrogate value for carbonized material marked a departure from an established agency preference and policy to rely on domestic data for the valuation of material inputs, rather than import statistics. GHC's Br. 14 (citing *Tianjin Magnesium Int'l Co. v. United States*, 34 CIT __, __, 722 F. Supp. 2d 1322, 1333 (2010) ("[W]hen the Department has a choice between domestic data and import statistics, Commerce's preference is to use domestic data." (citations omitted)); *Dorbest Ltd. v. United States*, 30 CIT 1671, 1688–89, 462 F. Supp. 2d 1262, 1278–79 (2006), *rev'd on other grounds*, 604 F.3d 1363 (Fed. Cir. 2010); *Hebei Metals & Minerals Imp. & Exp. Corp. v. United States*, 29 CIT 288, 294–303, 366 F. Supp. 2d 1264, 1269–77 (2005).

While it may be the case that Commerce has a preference for domestic data, the

Department, as has been noted, also prefers, whenever possible, to use data that (1) represents a

broad market average of prices for the input, and (2) is exclusive of taxes and duties.  *Jining*, 34

CIT at __, Slip Op. 10-134, at 23.  Had the record contained domestic countrywide data, that was

tax and duty free, GHC's claim might have had merit.  Here, although the Cocommunity data

represented domestic price information, the data (1) was regional and not countrywide, and (2)

was not shown to be tax and duty exclusive.  None of the cases relied upon by GHC involved

domestic price data that suffered from similar deficiencies as those in the data published in

Cocommunity.  Thus, these cases do not aid plaintiffs.


### C.        Specificity of HTS 4402

Plaintiffs also argue that, when valuing the carbonized material input, the Department was

required to employ a surrogate price for the type of carbonized material that they actually used in

their production processes.[16]  Jacobi's Br. 1–2; GHC's Br. 8–9.  Thus, they insist that, even though

the Philippine HTS 4402 heading covers the carbonized material derived from shell that Jacobi and

GHC used in their processes, the heading cannot be used because it also covers carbonized

material made from wood, which, they claim, neither company used in their production of

activated carbon.

---

[16]        Plaintiffs initially contended that carbonized material derived from wood could
not be used to make products covered by the Order, but have since seemingly abandoned this
argument when it was pointed out by the other parties that plaintiffs had inaccurately represented
to the court the Order's contents.  *See* Jacobi's Br. 16–18; Resp't Pls.' Reply Br. in Supp. of their
Mot. for J. on the Agency R. 14–15 (ECF Dkt. No. 68); GHC's Br. 13, 18–19; Def.'s Br. 16–17;
Def.-ints.' Br. 20–22.

For plaintiffs, because Commerce used a surrogate value for the carbonized material input

that was derived, in part, from a feedstock (i.e., wood) other than those used by Jacobi's and

GHC's suppliers (anthracite coal and coconut shell charcoal for Jacobi, and bituminous coal,

coconut shell charcoal, "and other carbonized materials" for GHC), HTS 4402 was not the best

available information on the record.  Jacobi's Br. 2 ("Very simply, the import data for HTS

category 4402 cannot possibly be considered the 'best information available' for carbonized

material because such import data for HTS category 4402 concerned primarily raw material

inputs [(i.e., wood)] that were not used by Jacobi to make the steam activated carbon produced

by Jacobi and exported to the United States."); *see* Letter from Francis J. Sailer, Grunfeld,

Desiderio, Lebowitz, Silverman & Klestadt LLP, to Secretary of Commerce, U.S. Department of

Commerce at 17, 22, CD 106, at bar code 3046449-01 (Dec. 14, 2011), ECF Dkt. No. 43 (Apr. 5,

2013) ("GHC's Supplemental Section D Response"); Letter from Daniel L. Porter, Counsel for

Jacobi, to The Honorable John Bryson, Secretary of Commerce, U.S. Department of Commerce

at 10–11, PD 109, at bar code 3041511-01 (Nov. 17, 2011), ECF Dkt. No. 43 (Apr. 5, 2013);

Letter from Ross Bidlingmaier, Counsel for Jacobi, to The Honorable Rebecca M. Blank, Acting

Secretary of Commerce, U.S. Department of Commerce at 99, 146, PD 29, at bar code 3027307-

01 (Sept. 1, 2011), ECF Dkt. No. 43 (Apr. 5, 2013).

With respect to plaintiffs' legal argument, the court finds that plaintiffs are correct, that the

factors of production actually used by a respondent are important, if not controlling, when

determining normal value.  This is because the purpose of a review is to determine a margin for a

respondent's product based on the valuation of the product's factors of production.  Were the

factors of production of another company used, even to make an identical product, the margin

would not be as accurate of a reflection of that respondent's cost of production.  *See Zhejiang*

*DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333, 1341 (Fed. Cir. 2011) ("In

determining the valuation of the factors of production, 'the critical question is whether the

methodology used by Commerce is based on the best available information and establishes the

antidumping margins as accurately as possible.'" (quoting *Shakeproof Assembly Components v.

United States*, 268 F.3d 1376, 1382 (Fed. Cir. 2001)). Thus, although the Order covers activated

carbon products manufactured using other inputs, here, the inputs actually used by plaintiffs must

be taken into account.

      Although plaintiffs are correct in their assessment of the importance of the inputs actually

used in the production of their activated carbon, their claims with respect to the HTS 4402 data fail

on substantial evidence grounds. As has been noted, both GHC and Jacobi use carbonized material

produced from shell and coal in their manufacturing processes. As part of their argument favoring

the use of the Cocommunity data over the data obtained from imports under HTS 4402, plaintiffs

insist that carbonized material derived from shell, and carbonized material derived from coal, are

comparably priced.

      Specifically, the Cocommunity data reflects the price for carbonized material derived from

shell, while the data for Philippine HTS 4402 includes import data for carbonized material derived

from shell, as well as other sources, such as wood. GHC argues that price data for coconut shell

charcoal (i.e., the Cocommunity price data) is the best available information, because the

Department found, in the initial less-than-fair value investigation and in its final results of remand

redetermination in the first administrative review of the Order, that coconut shell charcoal and

coal-based carbonized materials are comparably priced. GHC's Br. 15–16 (citing Certain

Activated Carbon from the PRC, 72 Fed. Reg. 9,508 (Dep't of Commerce Mar. 2, 2007) (final

determination of sales at less than fair value), and accompanying Issues and Decision

Memorandum at comment 16 ("In the instant case, as discussed in the *Preliminary Determination*, the Department found that the coconut shell charcoal value, although not identical to the coal-based carbonized material used by respondents, is comparable in that both products are a type of charcoal." (citation omitted) (internal quotation marks omitted)); Final Results of Redetermination Pursuant to Ct. Remand at 10–11, *Calgon Carbon Corp. v. United States*, No. 09-00524 (2011), ECF Dkt. No. 36 ("*Calgon Carbon* Remand Results") ("[O]ur re-examination of the record indicates that coconut shell charcoal shares similar properties with carbonized material and that those similar properties are essential in the production of activated carbon.  The expert's report found that coal-based carbonized materials used by Cherishmet and coconut shell charcoal are similar in porosity and adsorption, which are both properties essential in the production of activated carbon.  Thus, in this instance, between the two alternative Indian HTS categories, 'Other Cokes of Coal' and 'Coconut Shell Charcoal,' the Department determines that Indian HTS number 4402.00.10 'Coconut Shell Charcoal' results in a better, input-specific price for coal-based carbonized materials." (footnotes omitted)).  Thus, for plaintiffs, because both inputs (shell-derived carbonized material and coal-based carbonized material) that they employed in their production processes are comparably priced, they are both covered by the Cocommunity data relating to the price of shell.

Despite the Department's finding as to price comparability between shell charcoal and coal, this finding is not determinative here.  First, it is worth noting that the discussion leading up to the comparability finding is less than clear as to whether the price of shell-derived charcoal is comparable to that of coal-based carbonized material, or if the materials themselves are comparable for the use in the manufacture of activated carbon.  Although, in the Final Results of Redetermination Pursuant to Court Remand in the first administrative review of the antidumping

duty order, the Department concluded "that Indian HTS number 4402.00.10 'Coconut Shell

Charcoal' results in a better, input-specific *price* for coal-based carbonized materials," the

discussion leading up to this finding does not support the conclusion as to price.  *Calgon Carbon*

Remand Results at 11 (emphasis added).

Moreover, even if shell-based charcoal and coal-based carbonized materials have

comparable prices, the Cocommunity data is only marginally more useful on the basis of

specificity than the import data.  This is because HTS heading 4402 also encompasses shell-

derived carbonized material.  Thus, if coconut shell charcoal is "comparable" to coal-derived

carbonized material, the import heading covers entries comparably priced with coal-derived

carbonized material too.  The Cocommunity publication that covers price data for coconut shell

charcoal is only more specific to value coal-based carbonized material than HTS 4402 because

the import data also covers imports of wood-based carbonized material.  Thus, it is only the

possibility that the HTS 4402 data could contain some entries of carbonized material derived

from wood that arguably makes this data less comparable to the carbonized materials used by

GHC and Jacobi than the Cocommunity data.

This observation leads to plaintiffs' next argument.  Plaintiffs contend that the Philippine

HTS 4402 import data is less specific than the Cocommunity data because the heading covers

carbonized material derived from wood, which they insist, is a material that they did not use in the

production of their activated carbon.  As noted, plaintiffs argue, and the court has found, that the

factors of production actually used by a respondent in an administrative review are important, if

not controlling, in determining normal value.  Nonetheless, the record here does not support

plaintiffs' claim.

Despite arguments to the contrary, the record demonstrates that GHC has used wood as a

material in the production of its activated carbon.  *See* Letter from Francis J. Sailer, Grunfeld,

Desiderio, Lebowitz, Silverman & Klestadt LLP, to Secretary of Commerce, U.S. Department of

Commerce at 44, PD 17, at bar code 3025194-05 (Aug. 19, 2011), ECF Dkt. No. 43 (Apr. 5,

2013) ("We also produce variety high-grade pellet products with the materials of coconut shell,

nutshell and *wood*." (emphasis added)).  Moreover, Jacobi itself asserted in this review that the

carbonized material used to produce the subject merchandise can be derived from coconut shell

and coal, as was used by Jacobi and GHC, but also from wood, lignite, and other materials.  *See*

Letter from Ross Bidlingmaier, Counsel for Jacobi, to The Honorable John Bryson, Secretary of

Commerce, U.S. Department of Commerce at 13, PD 159, at bar code 3056304-01 (Feb. 10,

2012), ECF Dkt. No. 43 (Apr. 5, 2013) ("Jacobi's Additional Surrogate Value Information")

(listing the "[f]ixed carbon content of raw materials used for the production of activated carbon" to

include soft wood, hard wood, coconut shells, lignite, bituminous coal, and anthracite).  Thus,

contrary to plaintiffs' assertions, the record does not indicate unambiguously that neither Jacobi

nor GHC used carbonized material derived from wood in the production of their activated carbon

products during the POR.

Based on the foregoing, it appears that the Cocommunity data is only modestly more

specific to the carbonized material inputs used in the production of plaintiffs' activated carbon

than the import data found under HTS 4402.  The court's best available information inquiry,

however, does not end here.  Despite the specificity conclusion (which remains somewhat

uncertain based on the lack of clarity as to price comparability in the discussion in the *Calgon*

*Carbon* Remand Results), the Cocommunity data is unable to overcome the earlier discussed

deficiencies from which it suffers, i.e., that the publication's price data for coconut shell charcoal

did not represent a broad market average, and was not shown to be tax and duty exclusive.  Put

another way, Commerce was not unreasonable in finding that a slight superiority in specificity

failed to compensate for the Cocommunity data's deficiencies with respect to the limited breadth

of market prices it supplied and the lack of record evidence demonstrating that the publication's

prices were tax and duty free.


### D.    Imports Under HTS 4402

Finally, plaintiffs argue that imports made under HTS 4402 during the POR did not contain

any entries of coconut shell charcoal.  Jacobi's Br. 19.  For plaintiffs, if there were no imports of

the input used to produce the carbonized material that they employed in the manufacture of their

merchandise, then the surrogate value for that input is not the best available information.  GHC's

Br. 17–18 ("[D]uring [the] POR . . . there were no imports of coconut shell charcoal under HTS

4402000001.  As such, the Department succumbed to a clear error of fact in its belief that the

broad basket sub-heading HTS 4402.00 captured imports of coconut shell charcoal.  The issue

should be remanded to the Department to correct this erroneous finding of fact because it renders

the Department's choice as arbitrary and wholly unsupported by substantial evidence.").

Plaintiffs' only support on the record for this assertion, however, appears to be Jacobi's

own statement in its surrogate value comments submitted before the Department.  *See* Jacobi's

Surrogate Value Comments at 4 ("First, there are no data available for coconut shell charcoal

from the Philippines imported under [HTS 4402.00.00.01]"); Jacobi's Br. 20; GHC's Br. 17.

Beyond this assertion, plaintiffs do not point to any evidence that there were no inputs of shell-

derived carbonized material entered during the POR.  Thus, plaintiffs have failed to establish their

conclusion with probative record evidence.

E.     **Commerce Reasonably Determined the Surrogate Value for Carbonized Material**

Based on the foregoing, the Department's selection of data from Philippine HTS 4402 as the surrogate value for carbonized material in the present review is in accordance with law and supported by substantial evidence.  By their arguments, plaintiffs have demonstrated that the Cocommunity data is marginally more specific than the HTS 4402 data.  Because of the infirmities in the Cocommunity data, however, it is apparent that Commerce did not err in its selection of GTA import data from HTS 4402 ("Wood Charcoal (Including Shell or Nut Charcoal), Whether or Not Agglomerated") to provide the surrogate value for carbonized material.

Accordingly, the court finds that the Cocommunity data was not the best available information on the record with which to calculate the surrogate value for carbonized material.  In addition, Commerce reasonably determined that the Philippine GTA import data under HTS 4402 represents the best available information with which to value the carbonized material input used in the production of subject merchandise.

IV.    **COMMERCE'S CHOICE FOR A SURROGATE VALUE FOR TRUCK FREIGHT IS SUPPORTED BY SUBSTANTIAL EVIDENCE**

In the Preliminary Results, the primary surrogate country selected by the Department was Thailand.  Preliminary Results Surrogate Values Mem. at 1.  Specifically, "[t]o value the cost of transportation [(truck freight)] from the suppliers to the factory, the Department calculated a contemporaneous per-unit average rate based on publicly available data from Siam Partners Group Company Limited" ("Siam"), a Thai consulting company, for the year 2005, for the transportation of goods by truck from Bangkok to five other provinces in Thailand.  Truck Freight: Transportation Costs, Including Fuel Costs and Freight Rates, Preliminary Results

Surrogate Values Mem. at 9, Attach. 8 at 55.  Commerce computed the per-unit average rate by

dividing the cost per metric ton rates by the distance from each province to Bangkok.

Preliminary Results Surrogate Values Mem. at 9.  The Department then averaged the rates for

each province to obtain a cost per metric ton per kilometer rate of 0.903 baht.  Preliminary

Results Surrogate Values Mem. at 9.  Because the Siam data was from 2005, the Department

then inflated the rate using the Thai Producer Price Index.  Preliminary Results Surrogate Values

Mem. at 9.  As noted, the POR was April 1, 2010, through March 31, 2011.

For the reasons previously stated, the primary surrogate country selection was changed

from Thailand in the Preliminary Results, to the Philippines in the Final Results.  Thus, the

Department used Philippine data to revalue most of the major factors of production for the subject

merchandise, including the cost of truck freight from the suppliers to the factory.  *See* Final Results

Surrogate Values Mem. at 6.  In the Final Results, Commerce "calculated a contemporaneous per-

unit average rate based on publicly available data [as reported in] the Cost of Doing Business in

Legazpi City, Philippines" from the year 2010.  Final Results Surrogate Values Mem. at 6, 53.

Commerce computed the per-unit average rate by "taking the average of the high and low [p]eso

per [kilogram] rate, and then dividing that amount by the distance from Legazpi City to Manila" to

obtain a rate of 0.01 pesos per kilogram per kilometer.  Final Results Surrogate Values Mem. at 6.

This rate was substantially higher than that found in the Preliminary Results.

GHC objects to the Department's use of the Philippine data to value truck freight.  It argues

that, despite the agency's preference to use a single surrogate country, and despite having put the

Philippine data on the record itself and urging its use to value all of the factors of production,

Commerce should have continued to use the Thai truck freight data used in the Preliminary Results

as the surrogate value.  *See* GHC's Br. 35–36 (citing *Shantou Red Garden Foodstuff Co. v. United*

*States*, 36 CIT __, __, 880 F. Supp. 2d 1332, 1334–35 (2012)); *see generally* Case Br. of

Cherishmet Group and Datong Juqiang Activated Carbon Co., Ltd., PD 243 at 3081186-01(June

13, 2009), ECF Dkt. No. 43 (Apr. 5, 2013).  GHC claims that the Thai data was superior because,

(1) unlike the Philippine data, the Thai data "represent[ed] a broad market average covering a

range of prices" compared to the Philippine truck freight data which was based on a single route,

(2) "[t]he Philippine data fail[ed] to satisfy the 'specificity' criteria," because the reported data was

based on the transportation of "loose cargo," while the Thai data provided a truck freight cost for

fully loaded trucks, and (3) the Philippine data is aberrational as compared to the data used in prior

reviews of the Order (approximately eight times higher than the value used in any of the three prior

reviews).  GHC's Br. 31–34.

    As noted, Commerce's preference for surrogate information is to use data that is

"product-specific, representative of a broad market average, . . . contemporaneous with the

POR[,] and exclusive of taxes and duties."  *Jining*, 34 CIT at __, Slip Op. 10-134, at 23 (citation

omitted) (internal quotation marks omitted).  In addition, Commerce's regulations direct that "the

Secretary [of Commerce] normally will value all factors [of production] in a single surrogate

country."  19 C.F.R. § 351.408(c)(2).

    Having taken GHC's arguments into consideration, the court holds that the Department

reasonably found that Philippine data was the best available information with which to value truck

freight.  While the Thai data contains ten different price points, valuing the cost of transportation

from Bangkok to five other provinces, and may appear to be more probative in this regard, the Thai

data suffers from defects that diminish its worth.  *See* Truck Freight: Transportation Costs,

Including Fuel Costs and Freight Rates, Preliminary Results Surrogate Values Mem., Attach. 8 at

55.

Although GHC contends that the Philippine data lacked specificity because it was based on the transportation of "loose cargo" rather than that of a "full truckload," the court is unpersuaded. The Thai source is based on the rental cost of a truck carrying ten to twelve tons of cargo. *See* Truck Freight: Transportation Costs, Including Fuel Costs and Freight Rates, Preliminary Results Surrogate Values Mem., Attach. 8 at 55.  The source further states that a full cargo load for one of these trucks is thirteen tons. *See* Truck Freight: Transportation Costs, Including Fuel Costs and Freight Rates, Preliminary Results Surrogate Values Mem., Attach. 8 at 55.  The Philippine data, on the other hand, reported transportation costs for a truck carrying "loose cargo." *See* Final Results Surrogate Values Mem. at 51.  Nowhere in the Philippine data source does it define or explain the relevance or meaning of "loose cargo," nor has GHC offered anything to support its contention that the Philippine data based on the transportation of "loose cargo" is not representative of the transportation costs incurred for a fully loaded truck.  Thus, the Thai data appears to represent shipping costs for less than a full truckload of shipments, while there is no record evidence that the Philippine data is not representative of the shipping costs for a full truckload, albeit of loose cargo.  Without more, GHC's speculation that the Philippine data lacks specificity cannot be credited.

Additionally, GHC claims that the Philippine data is aberrational when compared to truck freight rates used by Commerce in prior reviews.  Its argument is premised on the observation that the surrogate value for truck freight selected in the Final Results is several times higher than the values applied in prior reviews when Indian data was employed.  Specifically, the Philippine data is eight times higher than the surrogate value selected in the Preliminary Results, based on the Thai data that GHC contends should be used, and eight times higher than the surrogate values selected in the three prior reviews, from Indian sources.  In other words, plaintiffs' objection, unsupported

by further record evidence, is that the Philippine prices must not be the best available information

because they are too high.  Thus, while plaintiffs' observation as to the cost ratios is, no doubt,

factually correct, without more it cannot be given much weight.

Despite plaintiffs' arguments, the Philippine source appears to be the best on the record.

First, the data is from 2010, and is thus, far more contemporaneous to the POR (April 1, 2010,

through March 31, 2011) than the Thai source which supplied its data from August 8, 2005, over

four years prior to the POR.  *Compare* Final Results Surrogate Values Mem. at 53, *with* Truck

Freight: Transportation Costs, Including Fuel Costs and Freight Rates, Preliminary Results

Surrogate Values Mem., Attach. 8 at 55.  Indeed, the Philippine data's contemporaneity was

expressly identified by Commerce as one of its principal reasons for abandoning the use of

Thailand as the primary surrogate country in favor of the Philippines.  *See* Issues & Dec. Mem. at

cmt. 1; *see, e.g.*, *Jining*, 34 CIT at __, Slip Op. 10-134, at 23 ("Commerce's practice, in selecting

the best available information for valuing [factors of production], is to select surrogate values

which are . . . contemporaneous with the POR . . . . This practice has found approval in this

Court." (citations omitted) (internal quotation marks omitted)).

Next, although the Philippine truck freight data relied upon by Commerce was based on the

price range of a single route, from Legazpi to Manila, there is evidence on the record for a second

route, from Legazpi to Naga/Tabaco, with the exact same price range.  *See* Final Results Surrogate

Values Mem. at 51 (listing price ranges from Legazpi to Manila of 5.00/kg to 8.00/kg, and from

Legazpi to Naga/Tabaco of 5.00/kg to 8.00/kg).  This suggests that the Legazpi to Manila rate is, in

fact, more representative than plaintiffs claim.

Finally, although not absolute, the Department is directed by its regulations to endeavor

to value all factors of production with a single surrogate country.  *See* 19 C.F.R. § 351.408(c)(2)

("[T]he Secretary [of Commerce] normally will value all factors [of production] in a single

surrogate country."). Courts have found that Commerce's single surrogate country preference is

strong and must be given significant weight. *See, e.g.*, *Clearon*, 37 CIT at __, Slip Op. 13-22, at

12. This Court and the U.S. Court of Appeals for the Federal Circuit have repeatedly confirmed

the reasonableness of the preference to restrict selections for surrogate values to a single surrogate

country. *See, e.g.*, *Dorbest Ltd. v. United States*, 604 F.3d 1363, 1367–68 (Fed. Cir. 2010) ("For

most of the factors of production, Commerce uses the values that prevail in a single market

economy country (called a 'surrogate country') that Commerce finds is both (a) economically

comparable to the non-market economy country in question and (b) a significant producer of the

merchandise in question." (citing 19 C.F.R. § 351.408(c)(2)); *Clearon*, 37 CIT at __, Slip Op. 13-

22, at 12 ("[T]he court must treat seriously the Department's preference for the use of a single

surrogate country." (citations omitted)); *Bristol Metals L.P. v. United States*, 34 CIT __, __, 703

F. Supp. 2d 1370, 1375–76 (2010).

This preference stems from the sensible conclusion that "deriving the surrogate data from

one surrogate country limits the amount of distortion introduced into [the Department's]

calculations because a domestic producer would be more likely to purchase a product available"

domestically. *Clearon*, 37 CIT at __, Slip Op. 13-22, at 12, 13 ("[T]he use of a 'single surrogate

country' is justified when . . . all other factors are 'fairly equal' because minimizing distortion

supports a finding that Commerce relied upon the best available information on the record.").

Moreover, the process of determining normal value by using data from a market economy

country to value factors of production used in manufacturing a product in a nonmarket economy

country is inexact enough without adding greater ambiguity, such as the inclusion of a third

market and yet another currency. Here, the Department valued most of the major inputs by using

Philippine prices, and its preference for valuing factors of production from a single country

weighs heavily in favor of valuing truck freight using the Philippine data derived from the Cost

of Doing Business.

Accordingly, because (1) the Philippine data is more specific than the Thai dataset on the

record, (2) the Philippine data is more contemporaneous to the POR than the competing Thai

dataset, (3) the Philippine data, while having fewer data points than the Thai data, is supported

by information from two routes, and (4) the court is mindful of Commerce's goal to minimize

distortion by means of its strong preference to value factors of production within a single surrogate

country, Commerce was reasonable in its choice of the Philippine data as the best available

information to value truck freight.  Thus, the Department's finding is supported by substantial

evidence.


## V.    COMMERCE'S CALCULATION OF THE SEPARATE RATE IS SUSTAINED

CAC and the separate rate respondents, Shanxi Industry and Tangshan, urge the court,

should it remand the Final Results to Commerce, to instruct the Department to recalculate the

dumping margin assigned to the separate rate respondents based on any recalculation of the rate

assigned to the mandatory respondents.  CAC's Mot. 2; Shanxi Industry's Br. 2; Tangshan's Mot.

2.  These companies raise no challenge with respect to the manner in which their rate was

calculated.  *See* Shanxi Industry's Br. 2 ("[I]n accordance with the law, Shanxi's margin was

calculated in a manner consistent with the Department's customary practice of assigning dumping

margins to non-individually investigated companies based on the margins calculated for the

exporters and producers that are individually investigated as mandatory respondents.").  Rather, the

success of their motions hinges solely on the merits of Jacobi and GHC's underlying motions,

challenging the surrogate values selected for carbonized material and truck freight, which the court

has found wanting.  Because the court sustains the Department's Final Results, the separate rate

respondents' motions for judgment on the agency record are thereby rendered moot.  Accordingly,

the separate rate calculated by the Department in the Final Results is sustained, and the motions of

CAC, Shanxi Industry, and Tangshan are denied.


### CONCLUSION

Based on the foregoing, it is hereby

ORDERED that the Department of Commerce's Final Results are sustained.  Judgment

will be entered accordingly.

Dated:      June 24, 2014
            New York, New York


                                        /s/ Richard K. Eaton
                                        Richard K. Eaton